Susan I. Robbins (SR 5759)
MILLER, CANFIELD, PADDOCK AND STONE P.L.L.C.
500 Fifth Avenue, Suite 1815
New York, New York 10110
(212) 704-4400

Attorneys for the Defendant
SABLE & ROSENFELD FOODS, LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
PARADISE PRODUCTS, CORP.,

                      Plaintiff,

      -against-

SABLE & ROSENFELD FOODS, LTD.,

                      Defendant.
----------------------------------------------------------------X

Civil No. 08 CV 0069 (RBS)

**ANSWER AND**
**<u>COUNTERCLAIMS</u>**

      The Defendant, Sable & Rosenfeld Foods, Ltd., by its attorneys, Miller, Canfield, Paddock and Stone, P.L.L.C., as and for its Answer and Counterclaims to the Complaint states as follows:

      1.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 of the complaint. However, in mid-October, 2007 David Lax, of Paradise Products Corp. ("Paradise"), informed Myra Sable of S&R, that Paradise was going out of business as of January 1, 2008.

      2.     Denies the allegations contained in paragraph 2 of the complaint, except admits that Defendant's principle place of business is located at 131 Avenue Road, Suite 200, Toronto, Ontario, Canada and that Defendant sells gourmet food products.

3. Admits the allegations contained in paragraph 3 of the complaint that at this time this Court has diversity jurisdiction over these claims pursuant to 28 U.S.C. §§ 1332, but denies knowledge or information sufficient to form a belief as to whether the amount in controversy exceeds $75,000.

4. Admits the allegations contained in paragraph 4 of the complaint that venue is this action is proper pursuant to 28 U.S.C. § 1391.

5. Repeats and realleges the responses contained in the foregoing paragraphs 1-4 as if fully set forth herein.

6. Admits the allegations contained in paragraph 6 of the complaint that on or about January 26, 2007, the Plaintiff and the Defendant entered into a Co-Packer Agreement (the "Agreement"), whereby the Plaintiff agreed to produce the Defendant's products with a 90 day lead time, Defendant would pay within 45 days and either party could terminate the agreement upon six months notification. A copy of the Agreement is annexed hereto as Exhibit "A."

7. Admits the allegations contained in paragraph 7 of the complaint but denies that the Plaintiff made payments and without complaints or dissatisfaction.

8. Admits the allegations contained in paragraph 8 of the complaint but denies that Plaintiff told Defendant that the Plaintiff was closing its business due to financial reasons. Rather, the owner of the Plaintiff informed the Defendant that it had to relocate its business and that since his sons were not interested in the business and he was going to retire.

9. Denies the allegations contained in paragraph 9 of the complaint.

10. Denies the allegations contained in paragraph 10 of the complaint.

11. Denies the allegations contained in paragraph 11 of the complaint.

12. Denies the allegations contained in paragraph 12 of the complaint.

13. Denies the allegation contained in paragraph 13 of the complaint but admits that the Defendant received 11,968 cases in October and November.

14. Admits the allegations contained in paragraph 14 of the complaint.

15. Admits the allegations contained in paragraph 15 of the complaint.

16. Admits the allegations contained in paragraph 16 of the complaint.

17. Admits the allegations contained in paragraph 17 of the complaint.

18. Admits the allegations contained in paragraph 18 of the complaint.

19. Denies the allegations contained in paragraph 19 of the complaint.

20. Denies the allegations contained in paragraph 20 of the complaint.

21. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 of the complaint.

22. Admits that Plaintiff sent the Defendant an e-mail inquiring when a specific payment would be made and setting forth invoices and amounts which would become due but denies the remainder of the allegations contained in paragraph 22 of the complaint.

23. Denies the allegations contained in paragraph 23 of the complaint.

24. Admits the allegations contained in paragraph 24 of the complaint except denies that this was the first time Defendant informed the Plaintiff that it was damaged by Plaintiff's inability to provide goods in the future.

25. Denies the allegations contained in paragraph 25 of the complaint.

26. Denies the allegations contained in paragraph 26 of the complaint as Defendant consistently informed Plaintiff of the problems with the products, the lack of delivery of the products and the problems associated with packaging the products.

27. Denies the allegations contained in paragraph 27 of the complaint.

28. Denies the allegations contained in paragraph 28 of the complaint.

29. Denies the allegations contained in paragraph 29 of the complaint.

30. Repeats and realleges the responses contained in the foregoing paragraphs 1- 29 as if fully set forth herein.

31. Denies the allegations contained in paragraph 31 of the complaint except admits that Plaintiff sent Defendant invoices which were disputed by the Defendant.

32. Denies the allegations contained in paragraph 32 of the complaint.

33. Denies the allegations contained in paragraph 33 of the complaint.

34. Denies the allegations contained in paragraph 34 of the complaint.

35. Denies the allegations contained in paragraph 35 of the complaint.

36. Denies the allegations contained in paragraph 36 of the complaint.

37. Repeats and realleges the responses contained in the foregoing paragraphs 1- 36 as if fully set forth herein.

38. Denies the allegations contained in paragraph 38 of the complaint.

39. Denies the allegations contained in paragraph 39 of the complaint.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSE

40. Plaintiff's claims are barred by the doctrine of unclean hands.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSE

41. Plaintiff's claims are barred because of its own material breaches.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

42. Plaintiff's complaint fails to state a cause of action on which relief may be granted.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

43. Plaintiff breached its agreement with Defendant in that Plaintiff did not produce acceptable products in a timely manner.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

44. Plaintiff breached its agreement with Defendant in that Plaintiff did not provide the Defendant with a six month termination notice.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

45. Plaintiff breached its agreement with Defendant in that Plaintiff goods were inferior and defective.

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE**

46.   Plaintiff is barred by the doctrines of waiver, estoppel and laches.

**FACTS COMMON TO ALL COUNTERCLAIMS**

47.   Defendant has been in the business of distributing over 20 specialty condiments such as olives, onions and cherries, for over 35 years.

48.   In or about August, 2006 Plaintiff and Defendant began discussions regarding Plaintiff producing Defendant's various products.  Thereafter, Plaintiff sent Defendant sample products.  In September, 2006 Defendant sent Plaintiff a projection of the goods it needed for 2007.  Plaintiff never told Defendant it would not be able to produce any goods for the Defendant in 2006.  In fact, despite the Defendant's numerous requests to the Plaintiff that it wanted to order goods from the Plaintiff, it was not until mid-October, 2006 that the Plaintiff gave its price proposal to the Defendant.

49.   In November, 2006, the Defendant gave its first order to the Plaintiff.  After Defendant gave its order to the Plaintiff, and for the first time, Plaintiff told the Defendant that it did not have the ingredients needed to produce the Defendant's orders and that it would take several weeks to get the ingredients and then additional time to make the products.

50.   Despite the Defendant informing the Plaintiff of its needs for containers and labels, the Plaintiff did not order containers until December, 2006.  Moreover, Plaintiff did not show the Defendant its labels until mid December, 2006.  Because the Plaintiff did not have the containers for the Defendant's product, the Defendant arranged for containers to be sent to the

Plaintiff. Packaging was a cost of the product and not an expense of the Defendant. To date, the Defendant has not received reimbursement for the packaging material it supplied to the Plaintiff.

51. Despite ordering products earlier, in January, 2007, Defendant received its first product of onions from the Plaintiff. The entire order was bad and had to be returned to the Plaintiff. Upon information and belief, Plaintiff did not add an ingredient to the product. The Defendant paid for the cost of returning the product and has not received a credit from the Plaintiff for this expense.

52. Defendant received further orders from the Plaintiff which it shipped to its distributors. These shipments also contained bad products and packaging. In or about April, 2007 and continuing until the present the Defendant has and continues to receive frequent complaints from its distributors and customers about the quality of its product produced by the Plaintiff.

53. The Defendant consistently informed Plaintiff that it was receiving complaints from its distributors and customers about the products. Also, the Defendant discovered that the jars containing the products were leaking and the Defendant informed the Plaintiff of this problem.

54. The Defendant continually asked the Plaintiff what was wrong with the products and the packaging and Defendant did not respond until late June, 2007 and then made excuses but finally agreed to change some of the ingredients and packaging so that the problems would not reoccur.

55. On June 12, 2007 the Defendant admitted it was upset with the situation and promised Defendant that it would investigate the cause of the problems and let the Defendant know what corrective action the Plaintiff would take. The Plaintiff never did so.

56. In June, Plaintiff told Defendant to return the bad products which Defendant did. Defendant incurred the cost of shipping although this is not an expense of the Defendant and the Plaintiff has not reimbursed the Defendant for this expense.

57. In March, 2007 Defendant ordered cherries from the Plaintiff which were not delivered to the Defendant until June, 2007. The cherries were small and inferior. Defendant informed Plaintiff of this.

58. Despite the Defendant's inquiries to the Plaintiff, the Plaintiff could not tell the Defendant which batches of product were bad. Therefore, the Defendant did not know what products were bad and thus the Defendant may have bad products in stores, warehouses and with its distributors.

59. Because the Defendant kept returning bad products to the Plaintiff, the Plaintiff did not fill the Defendant's new orders as placed. Additionally, when the Plaintiff finally sent the Defendant products, the amount of sent was always less than what the Defendant had ordered and what the Plaintiff agreed to supply. Accordingly, the Defendant never had enough product to meet the demands of its customers and distributors, thus losing revenue.

60. The Defendant continually informed the Plaintiff that its customers were complaining because they were out of products and inquiring when the Defendant would receive new products. The Defendant informed the Plaintiff that due to the Plaintiff's delay in producing

the Defendant's products it was losing customers, revenues and credibility in the food industry. The Plaintiff did not respond to these queries.

61.     Additionally, when the Plaintiff re-sent orders to the Defendant because the prior orders contained bad products, the Defendant was never sure if the resent products were good or bad.  This was exacerbated since the Plaintiff did not send the Defendant products to sample pursuant to the Agreement and therefore it was impossible for the Defendant to ever determine which products from which batches it received from the Plaintiff were good and which were not.

62.     In March, 2007, the Defendant learned that the Plaintiff had not ordered enough packaging materials for Defendant's product and therefore the Plaintiff did not fill Defendant's order as placed.  Because Defendant needed its product in order to fill its backorders with its customers, Defendant located and paid for its packaging needs and had the packaging sent to the Plaintiff so it could produce Defendant's products.  This was not a cost or responsibility of the Defendant and the Plaintiff has not reimbursed the Defendant for these expenditures.

63.     In the summer of 2007, Plaintiff began producing Defendant's orders with much smaller olives.  Defendant informed Plaintiff of the inferior product it was producing and that it was not in conformity with the Defendant's requirements for its product.

64.     On or about October 18, 2007, Plaintiff informed the Defendant that it was going out of business at the end of the year and that it would not produce all of the Defendant's orders. This was a breach of the Agreement as the Plaintiff did not give the Defendant six months notice as required by the Agreement.  Because of Plaintiff's breach, Defendant again was unable to timely fill its orders from its customers and distributors.

65.     Because of the inferior products produced by the Plaintiff, the faulty packaging by the Plaintiff of the Defendant's goods, the short supply of product produced by the Plaintiff and the delays in filling the Defendant's orders, Defendant has been injured.

### AS AND FOR A FIRST COUNTERCLAIM

66.     Defendant repeats, reiterates and realleges the allegations contained in paragraphs "47" through "65" as if they were more fully set forth herein.

67.     Plaintiff produced defective and inferior products which were not in conformity with Defendant's specifications.

68.     Plaintiff packaged the Defendant's goods in flawed containers so that the goods leaked and exploded.

69.     Plaintiff did not produce the goods as ordered.

70.     Defendant had to return to the Plaintiff the inferior goods which Plaintiff did not timely replace.

71.     Defendant continues to store the defective products it received from the Plaintiff in a warehouse, and which product it can not sell, thereby the Defendant continues to incur expenses for Plaintiff's substandard goods.

72.     Based upon the Plaintiff's numerous breaches Defendant has been damaged in an amount to be determined at trial but believed to be in excess of $160,000.

**A**S AND FOR A **S**ECOND **C**OUNTERCLAIM

73.     Defendant repeats, reiterates and realleges the allegations contained in paragraphs "47" through "72" as if they were more fully set forth herein.

74.     Defendant has received, and continues to receive, frequent complaints from its customers regarding the defective and inferior products produced by the Plaintiff.

75.     By reason of the Plaintiff's numerous breaches, Defendant has lost countless customers and upon information and belief, will lose future customers.

76.     By reason of the foregoing Defendant has been damaged in an amount to be determined at the time of trial but believed to be in excess of $200,000.

**A**S AND FOR A **T**HIRD **C**OUNTERCLAIM

77.     Defendant repeats, reiterates and realleges the allegations contained in paragraphs "47" through "76" as if they were more fully set forth herein.

78.     In not giving the Defendant six months notice that it was going out of business the Plaintiff left the Defendant without a supplier so that the Defendant was again unable to fill its orders with its customers and distributors, this losing revenue.

79.     Defendant incurred additional expenses in locating a new supplier and had new start-up expenses due to the Plaintiff's breach in terminating the contract without giving the requisite six months notice.

80.     By reason of the forgoing Defendant has been damaged in an amount to be determined at the time of trial but believed to be in excess of $100,000.

## AS AND FOR A FOURTH COUNTERCLAIM

81.     Defendant repeats, reiterates and realleges the allegations contained in paragraphs "47" through "80" as if they were more fully set forth herein.

82.     Prior to the Defendant's association with the Plaintiff, Defendant had an excellent reputation in the food business for quality condiments.

83.     Because of the Plaintiff's numerous breaches the Defendant's reputation and good name have been damaged.

84.     By reason of the forgoing Defendant has been damaged in an amount to be determined at the time of trial but believed to be in excess of $200,000.

WHEREFORE,  the Defendant demands judgment as follows:

(i)     Dismissing the complaint;

(ii)    On its first counterclaim an award of damages in an amount to be determined at the time of trial but believed to be in excess of $160,000;

(iii)   On its second counterclaim an award of damages in an amount to be determined at the time of trial but believed to be in excess of $200,000;

(iv)    On its third counterclaim an award of damages in an amount to be determined at the time of trial but believed to be in excess of $100,000;

(v)     On its fourth counterclaim an award of damages in an amount to be determined at the time of trial but believed to be in excess of $200,000;

(vi)    Awarding costs and disbursements of this action and reasonable attorneys' fees; and

    (vii)    Such other and further relief as this Court deems just and proper.

Dated: New York, New York
       May 21, 2008

                                    MILLER, CANFIELD, PADDOCK
                                      and STONE P.L.L.C.


                                    By: s/Susan I. Robbins
                                    Susan I. Robbins (SR 5759)
                                    Attorneys for the Defendant
                                    500 Fifth Avenue, Suite 1815
                                    New York, New York 10110
                                    Telephone: (212) 704-4400
                                    Facsimile: (212) 704-4410


TO:    Kane Kessler, PC
        Attorneys for the Plaintiff
        1350 Avenue of the Americas
        New York, New York 10019
        (212) 541-6222

## *CERTIFICATE OF SERVICE*

I hereby certify that on May 21, 20087**,** I electronically filed the Answer and Counterclaims with Exhibit 1 and Disclosure Statement with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

>Jeffrey H. Daichman, Esq.
>Kane Kessler, PC
>1350 Avenue of the Americas
>New York, New York  10019
>Telephone:  (212) 541-6222
>
>e-mail:  jdaichman@kanekessler.com
>
>Gillian Overland
>Kane Kessler, PC
>1350 Avenue of the Americas
>New York, New York  10019
>Telephone:  (212) 541-6222
>
>e-mail:  goverland@kanekessler.com


>s/ Susan I Robbins
>Susan I. Robbins (SR5759)
>Attorney for Defendant
>500 Fifth Avenue, Suite 1815
>New York NY  10110
>Telephone: (212) 704-4400
>robbins@millercanfield.com

GOURMET PRODUCTS SINCE 1970

# CO-PACKER AGREEMENT

1) **QUALITY OF PRODUCT**
   Co-packer must be certified and meet all FDA health standards.
   Quality control check points to be agree upon by all parties and set in place before first production run. (I.e. Lab facilities, incubation, retained samples, etc.)
   Sable & Rosenfeld representative to be allowed on-line as prearranged.

2) **CO-PACKING**
   Confidentiality agreement must be signed
   Terms set at net ~~60 days~~ 45 days
   Sable & Rosenfeld to be listed on co-packers insurance coverage. ✓

3) **GUARANTEED SHELF LIFE**
   Co-packer must guarantee a 12month shelf life on product produced. ✓
   Samples from each batch/run to be retained for a period of 2 years. ✓
   One case of each product to be sent to Sable & Rosenfeld U.S. office upon completion of ~~each~~ every third run.
   ~~If product separates before this time, co-packer to issue credit to Sable & Rosenfeld for total cost of product plus extra freight costs to re-ship to warehouse or customer.~~

5) **LEAD-TIME** 90 day
   A guaranteed lead time is required. Sable & Rosenfeld will be responsible for providing quantities (in batch sizes) in the required lead-time as specified by the co-packer. ~~If co-packer fails to deliver product on time, co-packer to be responsible for lost sales and any fines leveled to Sable & Rosenfeld by their clients.~~ Our offices will communicate any delays.

7) **PACKAGING**
   Product to be packed to agreed upon spec's. (Jar packed with appropriate ingredients, label, cap, seal (if applicable), carton size, SCC code etc.) If packing error, product to be repacked at co-packers expense. ✓

8) **PRICING**
   Pricing to be guaranteed for a minimum 6 month period.

9) **TERMINATION OF CO-PACK AGREEMENT**
   Six month lead time required for either party to terminate agreement.
   Co-packer to supply Sable & Rosenfeld with current and batch formulas.

PARADISE PRODUCTS CORP
_____
Authorizing Signature
Andrew M Lax
Name
Vice President
Title
1/26/07
Date

SABLE & ROSENFELD
_____
Authorizing Signature
Myra Sable
Name
President
Title
1/26/07
Date

Sable & Rosenfeld ~ Gourmet Products Since 1970
131 Avenue Road, Suite 200, Toronto, Ontario M5R 2H7 Tel: 416-929-4214 Fax: 416-929-6727
info@sableandrosenfeld.com  www.sableandrosenfeld.com